C.D. Michel - S.B.N. 144258
Glenn S. McRoberts - S.B.N. 144852
Don B. Kates - S.B.N. 039193
Jason A. Davis - S.B.N. 224250
TRUTANICH • MICHEL, LLP
407 North Harbor Boulevard
San Pedro, CA 90731
Telephone: 310-548-0410

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

NORTHERN  DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA SIDE BY SIDE SOCIETY, CALIFORNIA ASSOCIATION OF FIREARMS RETAILERS, FIFTY CALIBER SHOOTERS ASSOCIATION, DOUBLE GUN JOURNAL, SPORTS AFIELD, BARRETT FIREARMS MANUFACTURING, INC., CALIFORNIA RIFLE AND PISTOL ASSOCIATION, and ERIC WILLIAMS, | CASE NO. |

C 04 2198

COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
TO INVALIDATE COUNTY
ORDINANCE
TITLE 42 U.S.C. 1983 AND
RELATED STATE CLAIMS

DEMAND FOR  JURY TRIAL

UNITED STATES CONSTITUTION

1.    U.S. CONSTITUTION - FIRST
       AMENDMENT.
2.    DORMANT COMMERCE
       CLAUSE
3.    EQUAL PROTECTION
4.    U.S. CONSTITUTION - DUE
       PROCESS

CALIFORNIA CONSTITUTION AND
STATUTORY LAW

5.    CALIFORNIA CONSTITUTION -
       FREE SPEECH
6.    CALIFORNIA - EQUAL
       PROTECTION AND DUE
       PROCESS GUARANTEES
7.    CALIFORNIA STATE
       PREEMPTION (Penal code 12301
       & et seq. 12070 et seq., Government
       Code section 53071)

Plaintiffs,

v.

CONTRA COSTA COUNTY, a
municipality; CONTRA COSTA
COUNTY BOARD SUPERVISOR
JOHN M. GIOIA in his official
capacity; CONTRA COSTA
COUNTY BOARD SUPERVISOR
GAYLE B. UILKEMA  in her official
capacity; CONTRA COSTA
COUNTY BOARD SUPERVISOR
MARK DESAULNIER in his official
capacity; CONTRA COSTA
COUNTY BOARD SUPERVISOR
FEDERAL GLOVER in his official
capacity;CONTRA COSTA COUNTY
CLERK OF THE BOARD JANE
PENNINGTON in her official
capacity; CONTRA COSTA
COUNTY SHERIFF WARREN E.
RUPF in his official capacity,

Defendants.

1    COME now plaintiffs to allege as follows:

2    **INTRODUCTION**

3    1.  This case challenges CONTRA COSTA COUNTY ("CCC") Ordinance

4    No: 2004-10 ("Ordinance"), which provides that "[n]o person shall sell, give,

5    transfer ownership of, transfer, offer for sale, or display for sale any large caliber

6    firearm." The nominal purpose of the Ordinance is to "protect the health, safety, and

7    general welfare of the residents of Contra Costa County by prohibiting the sale of .50

8    caliber firearms in unincorporated areas of the County." This Ordinance subjects

9    those who sell, give, transfer ownership of, transfer, offer for sale, or display for sale

10   any large caliber firearm ("LCF"), including fifty caliber firearms, to prosecution,

11   and threatens firearm sellers who violate this ordinance, including federally licensed

12   retailers, manufacturers and distributors, to prosecution, de-licensure and other

13   administrative sanctions. (A true and correct copy of the Ordinance is attached hereto

14   as Exhibit "A" and incorporated herein by reference.) The Ordinance is invalid in the

15   following respects:

16   2.  The Ordinance interferes with and substantially burdens <u>interstate</u>

17   <u>commerce</u> in that its prohibition on the sale of LCF's, *including offers or displays*

18   *for sale* would require plaintiffs, who sell magazines carrying LCF advertisements, to

19   either publish a separate edition for the CCC area or to cease distributing their

20   magazine in CCC. Concomitantly, this interference and burden deprives plaintiffs of

21   their <u>free expression</u> rights to publish and distribute their magazine. Furthermore, the

22   Ordinance impermissibly burdens <u>commercial speech</u> by seeking to prevent CCC

23   firearms dealers from displaying firearms and offering to sell them outside the

24   county, where such transfers are wholly within the law.

25   3.  In addition, the Ordinance deprives plaintiffs and others desiring to purchase

26   LCFs of <u>equal protection</u> because it allows such purchases by individual  police

27   officers acting in their purely personal capacities as firearms collectors and

28   sportsmen.

1    4. As a matter of state law, the Ordinance is expressly, implicitly, and

2 statutorily <u>preempted</u> by California's state laws in two separate areas: (1) California

3 law has completely occupied the field of LCF regulation, limiting LCF's to firearms

4 *greater* than .60 caliber, and (2) California has occupied the entire field of firearms

5 regulation pertaining firearms used in television, video, and film production. Being

6 thus invalid, its restrictions on plaintiffs' use of their property are also a deprivation of

7 due process of law. Being thus invalid, the Ordinance's restrictions on plaintiffs' use

8 of their property are also a deprivation of <u>due process</u> of law.

9    5. Suing under 42 U.S.C. § 1983 and state constitutional and statutory

10 provisions, plaintiffs seek declaratory relief as to the invalidity of the Ordinance, and

11 injunctive relief prohibiting publication (or mandating de-publication) of the

12 Ordinance by CCC's Clerk of the Board and prohibiting enforcement of the

13 Ordinance by CCC's Sheriff. Plaintiffs further seek attorneys' fees under Title 42

14 U.S.C. §1988 and California Code of Civil Procedure ("CCP") section 1021.5.

15

16                  **JURISDICTION**

17    6. The Plaintiffs bring this action to enforce their free speech rights under the

18 First Amendment to the United States Constitution, to establish a violation of the

19 Dormant Commerce Clause of the United States Constitution (Article I, Section 8,

20 Clause 3), to redress their denial of Equal Protection of the law under the Fourteenth

21 Amendment to the United States Constitution, and to enforce their due process rights

22 under the Fourteenth Amendment to the United States Constitution. This Court has

23 jurisdiction pursuant to 28 U.S.C. §§ 1331. This Court has supplemental jurisdiction

24 over plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

25

26                     **VENUE**

27    7. Venue in this district is proper pursuant to 28 U.S.C. §1391(b). Defendants

28 are all located in the Northern District of California and the events giving rise to this

1  claim occurred in the Northern District of California.

2

3  **INTRADISTRICT ASSIGNMENT**

4  8. Assignment to the San Francisco Division of the Northern District Court is

5  proper pursuant to Civil L.R. 3-2(c) and (d). The events or omissions which give rise

6  to this claim occurred in Contra Costa County.

7

8  **PARTIES**

9  [PLAINTIFFS]

10  9. Plaintiff CALIFORNIA SIDE BY SIDE SOCIETY (hereinafter "CSSS") is

11  a non-profit, mutual-benefit 501(c)(7) tax-exempt California corporation with a

12  constitution, bylaws, board of directors and officers located at 32 Deer Forest Drive,

13  Monterey, CA 93940. The CSSS was founded  in 1995 to share the camaraderie of

14  the side by side gun with other collectors and shooters. Today the CSSS has

15  members throughout the western states, including in Contra Costa County,

16  California. CSSS members are men and women dedicated to the collection,

17  preservation, heritage, and enjoyment of the side by side shotgun and rifle.

18  10.  No other firearm elicits the romance of history and gunmaking like the

19  side by side. From early American subsistence hunting to Edwardian shoots in 19th

20  Century England and dangerous-game exploits in 20th Century Africa and India has

21  come a fascination with the side by side gun and a renaissance of interest among

22  modern collectors and sportsmen and women. Members of the CSSS are as diverse

23  as the guns they collect. Some have a love affair with a particular maker (Purdey,

24  L.C.Smith, Piotti, and many more). Others have a fascination for a particular type of

25  action (hammer, hammerless, sidelock, boxlock, sidelever, under lever, etc.). From

26  muzzleloaders to breechloaders, black powder to nitro, and small bore to .50 caliber

27  rifles and larger, members' varied interests spark much discussion--but the common

28  factor among all the members is that they enjoy collecting side by side firearms,

1   displaying them, and in most cases shooting them.  Social gatherings with display of

2   fine guns, catered lunch, guest speakers and an organized shoot are offered four

3   times each year. "Fun Shoots" are also offered, usually six times per year. Hunting

4   events are organized and sponsored on a statewide basis. The CSSS maintains an

5   active Web site and email system. A newsletter is sent to all members quarterly and

6   posted on the Web site. Inquiries may be sent via email, telephone, fax or postal

7   mail.

8       11.  CSSS appears in this action on its own behalf and on behalf of its

9   members, including members within CCC.  CSSS's members would otherwise have

10   standing to sue in their own right; the interests CSSS seeks to protect are germane to

11   the organization's purpose; and neither the claims asserted nor the equitable relief

12   requested herein requires the participation of individual CSSS members in this

13   lawsuit.

14      12.  Plaintiff CALIFORNIA ASSOCIATION OF FIREARMS RETAILERS

15   (hereinafter "CAFR") is a non-profit, mutual-benefit 501(c)(6) tax-exempt California

16   corporation with a constitution, bylaws, board of directors and officers with, its

17   initial agent for service process located at 407 North Harbor Boulevard, San Pedro,

18   CA 90731. CAFR is a organization of businessmen involved in the distribution and

19   retail sales of firearms.  Its purposes are to provide federally licensed firearm

20   retailers in California with a unified voice in regulatory and legislative affairs and to

21   pursue professional development opportunities and the promotion of responsible

22   business practices by fostering active membership participation in relations between

23   firearm retailers, industry, community, and government.

24      13.  CAFR represents its members, including firearm dealers and sellers

25   within CCC, future CCC firearm dealers, and their customers whose interests are in

26   stopping enforcement of the unlawful Ordinance, clarifying the meaning of the

27   Ordinance and its validity, and determining its application to them and to their

28   property.  CAFR members already do, and wish to continue to sell, give, transfer

1   ownership of, offer for sale, or display for sale rifles, activities which would be

2   prohibited by the Ordinance.

3       14.  CAFR appears in this action on its own behalf and on behalf of its

4   members, including firearm dealers and sellers within CCC (and, indirectly, their

5   customers).  CAFR's members would otherwise have standing to sue in their own

6   right; the interests CAFR seeks to protect are germane to the organization's purpose;

7   and neither the claims asserted nor the equitable relief requested herein requires the

8   participation of individual CAFR members in this lawsuit.

9       15.  Plaintiff FIFTY CALIBER SHOOTERS ASSOCIATION (hereinafter

10  "FCSA") is a non-profit membership organization under the laws of Tennessee with

11  bylaws, board of directors and officers, and is registered as a 501(c)(7) corporation

12  that is headquartered in Monroe, Utah 84754.

13      16.  FCSA was established in 1985 for the purpose of advancing the sporting

14  and other lawful uses of the fifty caliber cartridge. FCSA publishes a monthly

15  magazine, "Very High Power," that is distributed internationally and throughout the

16  United States. "Very High Power" contains advertisements that are "offers to sell"

17  fifty caliber firearms. Additionally, FCSA promotes their organization through their

18  website at www.FCSA.org.  This website contains a members only area that includes

19  classified advertisements from members offering to sell or desiring to purchase

20  LCF's.  Among its other activities, FCSA provides research, instruction, and serves

21  as a liaison between military and law enforcement communities.  All sanctioned

22  FCSA shooting competitions are conducted according to rules established by the

23  shooting members and published in the FCSA competition rules manual. FCSA

24  members join to promote the sporting aspects of fifty caliber shooting.  FCSA has

25  over 4,000 members, including members residing in CCC and within California

26  generally.  These CCC and California resident members include numerous persons

27  who wish to purchase rifles from a firearms dealer, including rifles that fall under the

28  Ordinance's definition of "large caliber firearm."  FCSA is continually contacted by

1    its members who seek advice on the meaning of the CCC Ordinance and its legality.

2    FCSA must expend staff and attorney time, as well as costs, in responding to those

3    member inquiries.

4        17. FCSA sues on its own behalf, in its representative capacity on behalf of

5    members in CCC and in California, generally. FCSA's members would otherwise

6    have standing to sue in their own right; the interests it seeks to protect are germane to

7    the organization's purpose;  and neither the claims asserted nor the relief requested

8    herein requires the participation of individual members in this lawsuit.

9        18. Plaintiff DOUBLE GUN JOURNAL (hereinafter "DGJ") is a partnership

10   under the laws of Michigan, where the DGJ headquarters is located.  DGJ first

11   journal was published in 1990 for the purpose of preserving and circulating

12   knowledge about double-barrel guns. DGJ publishes a quarterly journal, "DOUBLE

13   GUN JOURNAL," that is distributed internationally and throughout the United

14   States. "DOUBLE GUN JOURNAL" contains advertisements that are "offers to

15   sell" and/or "displays for sale" of Holland and Holland Rifles such as the .577 NE

16   Royal Deluxe Double Rifle, which costs $140,000.00 but is classified as an LCF

17   under the Ordinance.  (Sample advertisement of .500/465 Royal Double Rifle costing

18   $120,000 is attached as Exhibit B.)  These advertisements constitute "offers for sale"

19   and/or "displays for sale" of LCFs.  DGJ subscribers purchase the journals for the

20   articles written by experts in the field of fine firearms, including LCFs.  DGJ has

21   subscribers throughout the nation, including members residing in CCC and

22   California generally. The DGJ sues on its own behalf, in its representative capacity,

23   and on behalf of its subscribers in CCC.

24       19.  Plaintiff SPORTS AFIELD is a California Corporation.  SPORTS

25   AFIELD is America's original outdoor magazine, founded in 1887. It is devoted to

26   people who share a passion for high-end sporting pursuits, especially big-game

27   hunting in North America and Africa. The magazine focuses primarily on hunting

28   bears, elk, moose, caribou, trophy whitetails and mule deer, and bighorn sheep, as

7

1 | well as African plains game and dangerous animals such as Cape buffalo, lion, and
2 | leopard. In-depth articles about upland hunting for species such as quail and
3 | pheasant are also featured. Coverage of fine guns, optics, clothing, and equipment is
4 | an essential part of the magazine. SPORTS AFIELD runs regular departments in
5 | every issue that provide sound, practical advice to the serious hunter and shooter.
6 | These columns include Rifles, Shotguns, Survival, The Traveling Hunter, An
7 | Outfitter's View, Backcountry, Reports Afield, New Gear Review, and the Almanac,
8 | which features news, tips, facts, and lore for the true outdoorsman. SPORTS
9 | AFIELD derives its income from advertisements, which include advertisements such
10 | as the Dakota Arms, Inc., .570 Nitro Express which is deemed a LCF under the
11 | Ordinance. (See Exhibit C.) These advertisements are displays for sale and/or offers
12 | for sale of firearms prohibited by defendants' Ordinance.

13 |     20. Plaintiff BARRETT FIREARMS MANUFACTURING, INC. (hereinafter
14 | referred to as BARRETT) is a Tennessee S Corporation with it's headquarters in
15 | Murfeesboro, Tennessee. BARRETT was founded in 1983. BARRETT has become
16 | the premier manufacturer of .50 caliber rifles. Acceptance by shooters and utilization
17 | by law enforcement has proven them of outstanding reputation. BARRETT rifles are
18 | renowned for their quality, performance and safety. BARRETT is dedicated to the
19 | manufacture of high quality rifles and accessories for the sporting and law
20 | enforcement marketplace. BARRETT avidly supports firearm safety, responsibility,
21 | and the rights of individuals to keep and bear arms according to the Second
22 | Amendment of the United States Constitution. In Murfreesboro, Tennessee,
23 | BARRETT is actively producing high-grade rifles and other products. BARRETT
24 | advertises its products, including the California legal "Model 99," in magazines such
25 | as "Very High Power" and on the internet at www.barrettrifles.com. These display
26 | advertisements of fifty caliber centerfire rifles that are deemed LCFs under the
27 | Ordinance and are distributed to Contra Costa County residents. These
28 | advertisements are displays for sale and/or offers for sale of firearms prohibited by

1    defendants' Ordinance.

2        21.  Plaintiff CALIFORNIA RIFLE AND PISTOL ASSOCIATION

3    (hereinafter CRPA) is a non-profit membership organization and is incorporated

4    under the laws of California, with headquarters in Fullerton.  Among its other

5    activities, CRPA works to preserve and expand constitutional and statutory rights of

6    gun ownership, including the right to self-defense and the right to keep and bear

7    arms.  CRPA has 65,000 members, including members residing in Contra Costa

8    County who are members of the U.S. Armed Forces and police officers who desire to

9    purchase, sell, give, transfer, offer for sale and/or display for sale firearms deemed

10   LCFs under the Ordinance.

11       22.  CRPA sues on its own behalf, in its representative capacity on behalf of

12   members in CCC and in California, generally. CRPA's members would otherwise

13   have standing to sue in their own right; the interests it seeks to protect are germane to

14   the organization's purpose; and neither the claims asserted nor the relief requested

15   herein requires the participation of individual members in this lawsuit.

16       23.  Plaintiff ERIC WILLIAMS (hereinafter referred to as "WILLIAMS") is

17   a resident that owns property within Contra Costa County unincorporated.

18   WILLIAMS pays property taxes on this property to Contra Costa County.

19   WILLIAMS completed training to be a level three reserve officer for the City of

20   Berkeley.  WILLIAMS currently is employed as a software engineer for the

21   Lawrence Berkeley Laboratory (a national laboratory under the Department of

22   Energy).  For the past four years WILLIAMS has attended and competes in

23   tactical rifle competitions at the Sacramento Shooting Center in Sacramento,

24   California.  WILLIAMS is currently the Match Director for these events.

25   WILLIAMS is a certified rifle, pistol, personal protection and home firearm safety

26   instructor.  WILLIAMS desires to purchase a firearm that is deemed a LCF by the

27   Ordinance.  The Ordinance prohibits WILLIAMS from acquiring additional firearms

28   that are deemed LCFs and that are otherwise lawful.

1    24.  Plaintiffs FCSA, DBJ, SPORTS AFIELD and BARRETT are hereinafter

2    referred to as "PUBLISHER[S]."

3

4                              [DEFENDANTS]

5    25.  Defendant CONTRA COSTA COUNTY, a municipality, is a county

6    formed and authorized under the laws of the State of California.  It enacted, has

7    maintained, and is maintaining the subject Ordinance by action of the CCC Board of

8    Supervisors, which is CCC's governing body.

9    26.  Defendant CONTRA COSTA COUNTY SHERIFF WILLIAM E. RUPF

10   ("RUPF"), in his official capacity, is the County Sheriff at the Contra Costa County

11   Sheriff's Department.  RUPF, as the Contra Costa County Sheriff, is the principal

12   enforcer of the Ordinance.

13   27.  CONTRA COSTA COUNTY BOARD SUPERVISOR JOHN M. GIOIA

14   ("GIOIA"), in his official capacity, is a CCC Board Supervisor for District 1.  GIOIA

15   proposed and voted to pass the Ordinance.

16   28.  CONTRA COSTA COUNTY BOARD SUPERVISOR GAYLE B.

17   UILKEMA ("UILKEMA"), in her official capacity, is a CCC Board Supervisor for

18   District 2.  UILKEMA proposed and voted to pass the Ordinance.

19   29.  CONTRA COSTA COUNTY BOARD SUPERVISOR MARK

20   DESAULNIER ("DESAULNIER"), in his official capacity,  is a CCC Board

21   Supervisor for District 4.  DESAULNIER voted to pass Ordinance.

22   30.  CONTRA COSTA COUNTY BOARD SUPERVISOR FEDERAL

23   GLOVER ("GLOVER"), in his official capacity, is a CCC Board Supervisor for

24   District 4.  GLOVER voted to pass Ordinance.

25   31. CONTRA COSTA COUNTY CLERK OF THE BOARD JANE

26   PENNINGTON ("PENNINGTON"), in her official capacity, is the Clerk of the

27   Board for CCC.  PENNINGTON is responsible for maintaining and updating the

28   Ordinance Code for Contra Costa County, for publishing or causing to be published

1  new Ordinances, and for de-publishing illegal Ordinances.

2

3  ## FIRST CLAIM FOR RELIEF:

4  ## DENIAL OF  FREE SPEECH RIGHTS

5  ## (FEDERAL CONSTITUTION - FIRST AMENDMENT)

6  ## (By Plaintiff PUBLISHERS and CAFR Against all Defendants)

7  [DENIAL OF FREE PRESS RIGHTS OF

8  NATIONAL AND INTERNATIONAL PUBLICATION COMPANIES]

9  32.  Section 54-22.006, created by the Ordinance, prohibits any "offer for sale,

10  or display for sale" of an LCF.  As hereinbefore alleged, PUBLISHER plaintiffs

11  distribute magazines, journals, and/or newsletters that contain advertisements (both

12  commercial "display" advertisements and/or classified ads) that constitute offers for

13  sale and/or displays for sale of LCFs.

14  33.  These advertisements often include pictures that constitute offers and/or

15  displays for the sale of LCFs.

16  34.  By banning these advertisements and/or displays for sale of LCF's, the

17  Ordinance is depriving PUBLISHERS (and their members and their advertisers

18  whose rights PUBLISHERS properly represent in this suit) of their rights to

19  commercial free expression - freedom of the press.

20  35.  A national and international sporting magazine published by FCSA,

21  "Very High Power Magazine," which is circulated in CCC, but is published in the

22  state of Washington, is subject to criminal prosecution because it prints

23  advertisements that constitute an "offer" or "display for sale" of LCFs.  The only

24  alternative for "Very High Power Magazine," is for its Washington-based publisher

25  to discontinue accepting such advertisements in order to comply with CCC's

26  Ordinance or prohibit distribution to CCC.  The practical effect is to allow CCC to

27  set a national standard for the advertising of certain rifles.

28  36.  A national and international sporting journal published by DGJ, "Double

1 Barrel Journal," which is circulated in CCC, but is published in the state of

2 Michigan, is subject to criminal prosecution because it prints advertisements that

3 constitute an "offer" or "display for sale"of LCFs. The only alternative for "Double

4 Barrel Journal," is for its Michigan-based publisher to discontinue accepting such

5 advertisements in order to comply with CCC's Ordinance or prohibit distribution to

6 CCC. The practical effect is to allow CCC to set a national standard for the

7 advertising of certain rifles.

8     37. A national and international sporting magazine published by SPORTS

9 AFIELD, "Sports Afield Magazine," which is circulated in CCC, but is published in

10 Huntington, California, is subject to criminal prosecution because it prints

11 advertisements that constitute an "offer" or "display for sale"of LCFs. The only

12 alternative for "Sports Afield Magazine," is for its California based publisher to

13 discontinue taking such advertisements in order to comply with CCC's Ordinance or

14 prohibit distribution to CCC. The practical effect is to allow CCC to set a national

15 standard for the advertising of certain rifles.

16     38. BARRETT is a manufacturer of firearms that advertises its product

17 deemed to be LCFs by the Ordinance in "Very High Power" and other nationally

18 distributed publications. BARRETTs advertisements are distributed in CCC,

19 subjecting BARRETT to criminal prosecution because these advertisements

20 constitute an "offer" and/or "display" for sale of LCFs within CCC's jurisdiction.

21 Similarly, BARRETTs distributes similar advertisements on their website at

22 www.barrett-rifles.com. The only lawful alternative for BARRETT to avoid

23 criminal prosecution is to not advertise their product in publications that are

24 distributed within CCC and to cease all advertising of their product on the internet.

25 The practical effect is to allow CCC to set a national standard for the advertising of

26 certain rifles.

27     39. The interests here involved are not limited to commercial speech. Though

28 income from advertisements are vital to the existence of PUBLISHERS magazines,

1  journals, and/or newsletters, they are not their principal fare. The primary material in

2  PUBLISHERS' (excluding BARRETT) magazines, journals, and/or newsletters

3  consist of core non-commercial speech – discussions that are technical,

4  technological, educational, historical, social, economic and/or political. The effect of

5  the Ordinance is to bar PUBLISHERS magazines, journals and/or newsletters from

6  being distributed in CCC.

7       40.  The Ordinance has such an effect because PUBLISHERS cannot afford to

8  do without the remuneration which they derive from ads that offer and/or display

9  LCF's for sale. Neither can they afford to produce a special CCC edition sans the

10 revenue derived from these advertisements. PUBLISHERS only option if they

11 comply with the Ordinance would be not to distribute PUBLISHERS magazines,

12 journals and/or newsletter in CCC or to refuse any advertisements that offer or

13 display LCF's for sale despite the fact that the LCFs are currently legal for sale

14 throughout the entire United States.

15      41.  As hereinbefore set out, acting under color of law, defendants have and

16 are depriving PUBLISHERS, their members and their advertisers of rights, privileges

17 and immunities guaranteed them by the federal Constitution, to wit, the First and

18 Fourteenth Amendments.

19      42.   Plaintiffs are being irreparably injured and have no plain, speedy or

20 adequate remedy at law.

21      43.  There is an actual and present controversy between defendants on the one

22 hand, and PUBLISHERS, their members and their advertisers on the other.

23      44.  PUBLISHERS and their advertisers assert that the Ordinance

24 impermissibly infringes upon their core free expression rights to engage in

25 distribution of their magazines, journals, and/or newsletters in CCC and elsewhere as

26 well as their commercial speech rights. Defendants deny and dispute this, wherefore

27 PUBLISHERS seek a declaration of their rights and those of their advertisers and,

28 specifically, that the Ordinance violates the First Amendment.

[DENIAL OF FREE SPEECH RIGHTS
OF CCC FIREARMS DEALERS]

45. Plaintiffs reallege all previous paragraphs and incorporate them herein as if set out verbatim.

46. Defendants' legislative authority – and, thus, the Ordinance – extends only to CCC. Defendants cannot prohibit transfers, etc., of LCF's occurring in other locations. Thus, for instance, defendants cannot prohibit even CCC-based firearms dealers from transferring LCF's at such locations, including at gun shows held outside the county and including transfers to CCC residents at such non-CCC locations. California law specifically authorizes licensed firearms dealers to make sales and transfers at gun shows, wherever held.

47. Because such sales cannot be prohibited by defendants, current or prospective CCC firearms dealers represented by CAFR are entitled to: a) in their CCC stores display LCFs and offer them for sale, so long as the sale would occur outside of CCC; and b) display and offer LCFs for sale in advertisements in PUBLISHERS' magazines, journals, newsletters, and websites as well other publications such as newspaper classifieds. In purporting to prohibit such displays and offers, defendants are denying current and future CCC firearms dealers represented by CAFR, and similarly situated individuals, the freedom of expression guaranteed them by the First Amendment.

48. There is an actual and present controversy between defendants and CAFR. CAFR asserts that the Ordinance impermissibly trenches on their members' freedom of expression. Defendants deny and dispute this, wherefore plaintiff CAFR seeks a declaration of its (and its members') rights and, specifically, that the Ordinance is unconstitutional in this respect.

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF:**

**VIOLATION OF THE DORMANT COMMERCE CLAUSE**

**(FEDERAL CONSTITUTION - ARTICLE I, SECTION 8, CLAUSE 3)**

**(By PUBLISHERS Against all Defendants)**

49.  Plaintiffs reallege all previous paragraphs and incorporate them herein as if set out verbatim.

50.  With some exceptions, the Ordinance prohibits "offers to sell" and "the display for sale" of any firearm capable of firing a center-fire cartridges of .50 caliber or larger or .50 BMG caliber or larger, either by designation or by actual measurement.

51.  The Ordinance has impermissible extraterritorial effect.

52.  The Ordinance regulates and applies to commerce that occurs wholly outside California's borders.  It prohibits the advertisements ("offers to sell" and/or "displays for sale") of certain weapons regardless of the means of distribution, including but not limited to, magazines, newspapers, circulars, form letters, open publications, billboards, cards, or labels, that are published, circulated, or distributed in CCC.

53.  Certain PUBLISHERS suffer additional damages.  The operator of any website anywhere in the world that is offering or displaying LCF'S for sale is arguably violating the Ordinance because there is no feasible way to avoid making that offer accessible to people within CCC.   FCSA, for one, operates such websites.

54.  A publisher of a national magazine, journal and/or newsletter or website that contains "offers to sell" and/or a "display for sale" of LCFs that are prohibited by the Ordinance is faced with avoiding CCC altogether; complying with CCC's more restrictive Ordinance by removing advertisements that are "offers for sale" and/or "displays for sale" from their magazine, despite the fact that other municipalities within California and other states in which the magazine, journal, and/or newsletter is distributed would permit these "offers" and "displays to sell;" or

1   publish a separate edition for CCC in which prohibited advertisements "offering to

2   sell" LCFs are excised.

3        55.  This Ordinance causes PUBLISHERS to incur prohibitive costs and

4   constitutes an impermissible burden upon interstate commerce.

5        56.  The benefits of the Ordinance do not outweigh the burden since, among

6   many other reasons:  few, if any, LCFs are ever sold or transferred within CCC; no

7   LCF has been used in a crime within CCC; the State already regulates LCFs (which

8   it defines as anything greater than .60 caliber as opposed to .50 or greater as the

9   Ordinance defines it); and the Ordinance substantially interferes with interstate

10  commerce in publishing, including but not limited to, magazines, journals,

11  newsletters, newspapers and/or websites that include advertisements and classifieds

12  that offer and/or display LCFs for sale.

13       57.  The Ordinance imposes a clearly excessive burden in relation to the

14  putative local benefit to the CCC.  Less restrictive methods of obtaining CCC's goals

15  are available.

16       58.  As hereinbefore alleged, acting under color of law, defendants have and

17  are denying plaintiffs and those similarly situated of rights preserved to them by  the

18  Commerce Clause of the United States Constitution.

19       59.  There is an actual and present controversy between defendants and FCSA.

20  FCSA asserts that the Ordinance impermissibly trenches on their freedom of action

21  under the Commerce Clause. Defendants deny and dispute this, wherefore plaintiff

22  FCSA seeks a declaration of its rights and those of its advertisers and, specifically,

23  that the Ordinance is unconstitutional in this respect.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

# THIRD CLAIM FOR RELIEF:
## DENIAL OF EQUAL PROTECTION
### (FEDERAL CONSTITUTION-14TH AMENDMENT )
### (By Plaintiffs WILLIAMS, CAFR and FCSA Against All Defendants)

60.  Plaintiff reallege all previous paragraphs and incorporate them herein as if set out verbatim.

61.  The Ordinance allows law enforcement agencies and both federal and local police officers to purchase LCF's. (Ordinance, sec. 54-22.008 (b) 1-6.) But the exceptions for federal and state police officers are nowhere limited to the tiny number of officers using LCFs for official duty purposes.  As written, these exemptions allow every federal and state police officer to purchase an LCF for purely private purposes, e.g., as an addition to a personal gun collection or for hunting or target shooting.

62.  If private persons are not allowed to purchase LCFs for addition to their personal gun collection or for hunting or target shooting or other purely private purposes there is no reason why police officers should be allowed to do so without any connection to their official duties. Such a distinction bears no rational relation to the purposes of the Ordinance, nor does it bear any relationship to the safety and/or welfare of the people of CCC.  Rather, it merely creates a subclass of private citizens that are provided the privilege to purchase LCF's while the majority of the citizenry is denied that privilege.

63.  But for the ordinance, these plaintiffs would continue to possess, sell, and acquire LCF'I'm on page 18 and there ar3e a lot of lis.  The ordinance forces them into the dilemma of risking prosecution or removing their property from the County and thus losing the use thereof.

64.  The federal and state police officer exemptions constitute a deprivation under color of law of rights, privileges and immunities guaranteed to plaintiffs by the equal protection clause of the 14th Amendment.

1    65.  There is an actual and present controversy between plaintiffs and

2    defendants as to the constitutionality of the Ordinance's police officer exemptions.

3    Plaintiffs contend, and defendants deny, that these exemptions are repugnant to the

4    equal protection clause of the 14th Amendment. Wherefore plaintiffs seek a

5    declaration of their rights and, specifically, that the Ordinance is unconstitutional in

6    this respect.

7

8    **FOURTH CLAIM FOR RELIEF:**

9    **VIOLATION OF FEDERAL DUE PROCESS**

10   **(FEDERAL CONSTITUTION-14TH AMENDMENT )**

11   **(By WILLIAMS, CAFR, AND FCSA Against All Defendants)**

12   66.  Plaintiffs reallege all previous paragraphs and incorporate them herein as

13   if set out verbatim.

14   67.  The due process rights of Americans include the rights to acquire, enjoy

15   and dispose of property. These rights may be circumscribed as to particular property

16   by **valid** legislation. The Ordinance is invalid because, as hereinafter alleged, it is in

17   conflict with, and preempted by, state law.

18   68.  The Ordinance states that "no person shall sell, give, transfer ownership

19   of, transfer, offer for sale, or display for sale any large caliber firearm." The

20   Ordinance, thus, deprives plaintiffs of due process in the following respects: it

21   precludes their acquiring of LCF's in CCC; it precludes their transferring to another

22   person on the target range, or at an exhibition for the purposes of examining or firing

23   their LCF's even temporarily; and it precludes their selling or even offering for sale

24   their LCF's.

25   69.  There is an actual and present controversy between plaintiffs and

26   defendants as to the constitutionality of the Ordinance. Plaintiffs contend, and

27   defendants deny, that the Ordinance is repugnant to the due process clause of the 14th

28   Amendment. Wherefore plaintiffs seek a declaration of their rights and, specifically,

1  that the Ordinance is unconstitutional in this respect.

2

3  ## FIFTH CLAIM FOR RELIEF:

4  ## VIOLATION OF FREE SPEECH GUARANTEES

5  ## (CALIFORNIA CONSTITUTION - ARTICLE I SECTION 2)

6  ### (By All Plaintiffs Against All Defendants)

7      70.  Plaintiffs reallege all previous paragraphs and incorporate them herein as

8  if set out verbatim.

9      71.  For the reasons stated above with regard to the United States Constitution,

10  the Ordinance also violates the free press and speech provisions of the California

11  Constitution.

12      72.  There is an actual and present controversy between plaintiffs and

13  defendants as to the constitutionality of the Ordinance.  Plaintiffs contend, and

14  defendants deny, that the Ordinance violates the free press and speech provisions of

15  the California Constitution. Wherefore plaintiffs seek a declaration of their rights

16  and, specifically, that the Ordinance is unconstitutional in this respect.

17

18  ## SIXTH CLAIM FOR RELIEF:

19  ## EQUAL PROTECTION AND DUE PROCESS GUARANTEES

20  ## (CALIFORNIA CONSTITUTION - ARTICLE I SECTION 7)

21  ### (By WILLIAMS, CAFR, CSSS, FCSA Against All Defendants)

22      73.  Plaintiffs reallege all prior paragraphs and incorporate them herein as if

23  set out verbatim.

24      74.  For the reasons stated above with regard to the United States Constitution,

25  the Ordinance also violates the due process and equal protection guarantees of the

26  California Constitution.

27      75.  There is an actual and present controversy between plaintiffs and

28  defendants as to the constitutionality of the Ordinance. Plaintiffs contend, and

1 defendants deny, that the Ordinance violates the due process and equal protection
2 guarantees of the California Constitution. Wherefore plaintiffs seek a declaration of
3 their rights and, specifically, that the Ordinance is unconstitutional in this respect.

4

5 **SEVENTH CLAIM FOR RELIEF:**
6 **CALIFORNIA STATE PREEMPTION**
7 **(CALIFORNIA CONSTITUTION ARTICLE XI SECTION 7**
8 **PEN. CODE §12301 ET SEQ. & 12070 ET SEQ.; GOV'T CODE §53071; )**
9 **(By All Plaintiffs Against All Defendants)**

10       76.  Plaintiffs reallege and incorporate herein all foregoing paragraphs as if set
11 out verbatim.

12       77.  Defendants' Ordinance is preempted by California Constitution Article XI
13 section 7 because it duplicates state enactments, it prohibits what the State permits,
14 and California law fully occupies the particular field of "large caliber firearms"
15 legislation to the extent that there is no room for local regulation.  Defendants'
16 attempts to impose additional regulations in that field conflict with the state law, and
17 are therefore void, even if a particular provision in the Ordinance does not directly
18 duplicate or otherwise directly conflict with any express provision of the state law.

19       78.  Defendants ordinance is also preempted by Penal Code sections 12301 et
20 seq., as its legislative history clearly demonstrates that the State exclusively regulates
21 and occupies the entire field of firearms based upon their destructive capabilities, i.e.,
22 large caliber firearms /military type weapons / destructive devices, regardless of the
23 label placed upon such weapons, and because the Ordinance conflicts with the
24 State's specific and expressed intent to limit such regulations and licensing to
25 firearms *exceeding* .60 calibers.

26 / / /
27 / / /
28 / / /

1  [REPORT OF THE ASSEMBLY INTERIM COMMITTEE
ON CRIMINAL PROCEDURE
2  ON SEARCH AND SEIZURE, PREEMPTION; WATTS;
FIREARMS CONTROL]
3  79.  In 1966, an interim study of the weapons control laws in California was

4  conducted by the Assembly Committee on Criminal Procedure ("Committee").  The

5  final result, completed January 1967, was the "Report of the Assembly Interim

6  Committee on Criminal Procedure on Search and Seizure, Preemption, Watts,

7  Firearm Control" ("Report"):

8       The committee did not undertake a general study of the subject of
firearms control during the 1965-1967 interim period [because the
9       committee already conducted a general study of the subject during the
1963-1965 interim period].  However, in the course of the committee's
10      hearings on the Los Angeles riot the Attorney General of California and
officers of the Los Angeles Police Department pointed out certain
11      defects in the law governing the control of weapons.  The committee
felt that the problems pointed out by these officials were sufficiently
12      serious to warrant holding a hearing for the purposes of taking
additional testimony on the subject.
13

14  80.  The Report describes the investigation that the Committee conducted on

15  the issue of large caliber firearms:

16      On October 13, 1966, the committee attended a demonstration firing,
arranged by the Attorney General, to observe the operation and effect of
17      certain military-type weapons and new firearms now generally available
to private citizens in California.  The following day, October 14, 1966,
18      the committee convened in Los Angeles to take testimony from
Attorney General Lynch, officials of the Los Angeles Police
19      Department, and private citizens interested in weapons controls.

20  81.  As a result of these hearings, the Committee became concerned over the

21  availability in California of antitank guns and other military type weapons:

22      The tremendous destructive potential of these weapons make them unfit
for use outside the confines of a military reservation but they are
23      nevertheless readily available through mail order houses and retail
outlets around the state.  While we have extensive provisions in the
24      Penal Code regulating the sale and possession of concealable weapons
there are no statues regulating the sale or possession of military
25      armaments.

26  82.  The Report recommended legislation prohibiting the sale, possession, or

27  transportation of these devices, but excepted, through a lower caliber limit, firearms

28  that serve legitimate sporting and hunting purposes:

Since the definition of a "destructive device" is written in terms of fixed ammunition of more than .60 caliber and firearms of more than .60 caliber which fire such ammunition, it will not restrict the activities of those who collect or target shoot with large caliber antique weapons...." *By limiting the definition of a "destructive device" to firearms and ammunition of more than .60 caliber and excluding shotguns and their ammunition the committee intends that the recommended legislation not restrict the sale or use of firearms used for hunting or target shooting. The .60 caliber limitation appears to be a reasonable dividing line since that is the distinction which the United States Army draws between small and heavy arms.* (Multiple emphasis added.)

83. In the Report, the Committee specifically recommended that the "sale, possession, or transportation of 'destructive devices' such as . . . *'large caliber arms and ammunition'* be prohibited." (Emphasis added.)

84. The Attorney General presented evidence to the Assembly Committee on Criminal Procedure during its study, and brought to the attention of the Committee several inadequacies in the existing regulations of deadly and dangerous weapons.

[ASSEMBLY BILL 1326]

85. As a result of the Report, on March 28, 1967 Assemblyman W. Craig Biddle (Vice Chairman of the Assembly Committee on Criminal Procedure) proposed AB1326, which added Chapter 2.5 (commencing with Section 12301) to Title 2 of Part 4 of the Penal Code, regulating and licensing "destructive devices" by requiring every dealer, manufacturer, importer and exporter of certain defined devices and every person possessing or transporting any such device, to obtain State issued permits, and providing penalties for violations.

86. On August 4, 1967, having been passed by both the Assembly (unanimously) and the Senate (24 ayes to 2 noes), AB1326 was enrolled and sent to Governor Ronald Reagan for signing.

87. Also on August 4, 1967, the author of AB1326, Assemblyman W. Craig Biddle, sent Governor Reagan an Analysis and Explanation of AB1326. The analysis detailed that the lesser calibers (such as .50 caliber rifles) were considered and intentionally exempted from the permit requirements imposed by AB1326 through the use of a caliber limit:

By limiting its application to weapons larger than .60 caliber, the bill will not restrict the use of known hunting weapons. [Because many shotguns exceed .60 calibers in size, and would otherwise be prohibited by this limitation, a] specific exemption for shotguns is incorporated in the bill.

This bill was supported by the Attorney General, the California District Attorneys' Association, California Peace Officers' Association, and the National Rifle Association.

In fact, many other letters to Governor Reagan repeat the same intent of the State to exclude from prohibitions based upon destructive capabilities and to allow the unimpeded sale of firearms of .60 calibers or less.

88.  In an August 14, 1967 letter to Governor Reagan from Deputy Attorney General Harold F. Bradford, the bill's scope is described as follows:

Assembly Bill 1326 deals with weapons and devices which are commonly referred to as "military-type weapons" and "heavy weapons"; such weapons are referred to in the bill as Destructive Devices. With the exception of minor regulations relating to explosives or fire hazards, there are presently no laws in California which regulate the military surplus and similarly large weapons which are available on the open market. These military weapons and similar devices are extremely hazardous and possess great destructive capacity; they have no legitimate sport or hunting value, and the need for regulation of such devices is clear.

Also included within the definition of "Destructive Devices" are weapons which fire fixed ammunition or which launch rockets, as well as the ammunition and the rockets for such weapons, if the weapons are of a caliber larger than .60 calibre [sic]; an example of a weapon which would be included in this category are the anti-tank cannons which have become a

This letter emphasized that the purpose of placing a lower limit of caliber size at .60 caliber was that "by limiting its application to weapons larger than .60 calibre [sic], the bill will not restrict the use of known hunting weapons."

89.  In an August 15, 1967 Bill Memorandum to Governor Reagan, Senate Legislative Secretary Vernon L. Sturgeon and Assembly Legislative Secretary Jack B. Lindsey noted that:

Also included within the definition of weapons which fire fixed ammunition for such weapons, if the weapons are of a calibre [sic] larger than .60 caliber; an example of a weapon which would be included in this category are the anti-tank cannons which have become available through military surplus sources.
*It is important to note that Assembly Bill 1326 applies only to weapons. . . . By limiting its application to weapons larger than .60*

23

*caliber, the bill will not restrict the use of known hunting weapons,* and a specific exemption for shotguns is incorporated in the bill. (Emphasis added.)

90.  On August 18, 1967, Governor Reagan signed AB1326, thereby creating Penal Code section 12301 et seq.

[Penal Code 12301 et. Seq.]

91.  California's state "Destructive Device" law comprehensively covers those rifles that the Legislature deemed appropriate to specially regulate because of caliber size and degree of destructiveness. The Destructive Device law regulates and licenses only firearms having a caliber greater than .60, but does not cover firearms of .50 caliber. (A particular rifle of .50 caliber, the Barrett M82 rifle (as configured by the Manufacturer) is classified, and subjected to special regulation, as an "assault weapon.")

92.  The Ordinance is an attempt to redefine, substitute for and add to the Destructive Device Law, extending it from firearms capable of firing fixed ammunition greater than .60 caliber to include lesser firearms of only .50 caliber.

93.  California's state Destructive Device law is a comprehensive regulatory scheme governing devices that the State Legislature deemed to be destructive devices including, but not limited to, firearms that fire ammunition exceeding a certain caliber in size due to the destructive capabilities of these firearms. The state scheme is a comprehensive one, defining on a statewide basis which firearms should be regulated based upon the caliber and destructive capability. No local regulation of firearms within that subject is permissible. Local ordinances regulating firearms based upon caliber and destructive capabilities are impermissible. The state has set the level at which "large caliber firearms" are to be regulated because of caliber and destructive capacity as any firearm that can fire fixed ammunition greater than 0.60 caliber.

94.  Specifically, Penal Code section 12301(a)(3) defines "destructive devices" as including:

*any weapon of a caliber greater than 0.60 caliber* which fires fixed ammunition, or any ammunition therefor, other than a shotgun (smooth or rifled bore) conforming to the definition of a "destructive device" found in subsection (b) of Section 179.11 of Title 27 of the Code of Federal Regulations, shotgun ammunition (single projectile or shot), antique rifle, or an antique cannon. For purposes of this section, the term "antique cannon" means any cannon manufactured before January 1, 1899, which has been rendered incapable of firing or for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade. The term "antique rifle" means a firearm conforming to the definition of an "antique firearm" in Section 179.11 of Title 27 of the Code of Federal Regulations.

95. Within California Penal Code section 12305, the State Legislature provides a detailed regulatory licensing mechanism of *exceptions to the prohibition* on possession and transportation of any firearm that can fire a cartridge greater than .60 caliber:

(a) Every dealer, manufacturer, importer, and exporter of any destructive device, or any motion picture or television studio using destructive devices in the conduct of its business, shall obtain a permit for the conduct of that business from the Department of Justice.

(b) Any person, firm, or corporation not mentioned in subdivision (a) shall obtain a permit from the Department of Justice in order to possess or transport any destructive device. No permit shall be issued to any person who meets any of the following criteria:

(1) Has been convicted of any felony.
(2) Is addicted to the use of any narcotic drug.
(3) Is a person in a class prohibited by Section 8100 or 8103 of the Welfare and Institutions Code or Section 12021 or 12021.1 of this code.

(c) Applications for permits shall be filed in writing, signed by the applicant if an individual, or by a member or officer qualified to sign if the applicant is a firm or corporation, and shall state the name, business in which engaged, business address and a full description of the use to which the destructive devices are to be put.

(d) Applications and permits shall be uniform throughout the state on forms prescribed by the Department of Justice.

(e) Each applicant for a permit shall pay at the time of filing his or her application a fee not to exceed the application processing costs of the Department of Justice. A permit granted pursuant to this article may be renewed one year from the date of issuance, and annually thereafter, upon the filing of a renewal application and the payment of a permit renewal fee not to exceed the application processing costs of the Department of Justice. After the department establishes fees sufficient in amount to cover processing costs, the amount of the fees shall only increase at a rate not to exceed the legislatively approved cost-of-living

adjustment for the department.

(f) Except as provided in subdivision (g), the Department of Justice shall, for every person, firm, or corporation to whom a permit is issued pursuant to this article, annually conduct an inspection for security and safe storage purposes, and to reconcile the inventory of destructive devices.

(g) A person, firm, or corporation with an inventory of fewer than five devices that require any Department of Justice permit shall be subject to an inspection for security and safe storage purposes, and to reconcile inventory, once every five years, or more frequently if determined by the department.

(h) Subdivisions (f) and (g) shall not apply to individuals possessing an assault weapon pursuant to a permit issued by the Department of Justice for noncommercial purposes.

[CONSTITUTIONAL PREEMPTION BY 12301 ET SEQ.]

96. As already alleged, a number of the plaintiffs desire to sell and/or transfer LCF's that are prohibited by CCC, but are otherwise permitted to be sold, offered or displayed for sale, given, lent or transferred within the state of California. But the Ordinance purports to flatly prohibit a person from selling, offering or displaying for sale, giving, lending or transferring ownership of the firearms it covers and deems highly destructive -- even though the Legislature, having reviewed the subject matter, has not so regulated them, choosing to expressly exclude them by setting the caliber limit at anything greater than .60 caliber, instead of .50 caliber.

97. None of the exceptions within Penal Code section 12305 or licenses provided in the state legislative scheme appear in or apply to the firearms regulated under the Ordinance, which is therefore contradictory to the State scheme. This is because the State expressly exempts from such licenses firearms that can fire cartridges that are sixty calibers or less. Thus the Ordinance conflicts with state law by creating a licensing and regulation scheme for the firearms expressly exempted from Penal Code section 12301 because the State deemed them to have legitimate hunting and target uses for the general public.

98. The Ordinance conflicts with existing law. The Ordinance lowers the

1  level of "large caliber firearms" or "destructive devices" to .50 caliber, which is

2  below the expressed lower limit of large caliber firearms set by the State legislature

3  at .61 caliber.  The impermissible effect of the Ordinance is to create a class of

4  firearms of lesser caliber that persons with "Destructive Device Permits" (which

5  allows the acquisition of "large caliber firearms") cannot acquire.  Firearms of less

6  than .50 caliber may be sold or transferred within CCC without a Dangerous

7  Weapons Permit, firearms between .50 caliber and .60 caliber are prohibited from

8  being sold or transferred to persons with or without a Dangerous Weapons Permit,

9  while firearms of calibers exceeding .60 caliber may be sold or transferred to persons

10  with a permit.  The fact that lesser calibers are completely prohibited, regardless of

11  whether the persons acquiring the firearm possesses a Destructive Device Permit for

12  the acquisition of firearms greater than .60 caliber creates a conflict in that persons

13  with such permits may not acquire lesser caliber firearms (i.e. .50 - .60 caliber

14  firearms) unless they fall within one of the narrow exemptions provided under the

15  ordinance.

16       99. The Ordinance intrudes into an area that is fully occupied by general law

17  where the legislature has impliedly manifested its intent to fully occupy the area in

18  light of the following indicia:

19       • The subject matter regulating firearms based upon caliber size and their

20  destructive capabilities has been completely covered by general law as to clearly

21  indicate that it has become exclusively a matter of state concern.

22       • The subject matter regulating firearms based upon caliber size and their

23  destructive capabilities has been covered by general law couched in such terms as to

24  indicate clearly that a paramount state concern will not tolerate further or additional

25  local action.

26       • The subject matter regulating firearms based upon caliber size and their

27  destructive capabilities has been covered by general law, and the subject is of such a

28  nature that the adverse affect of a local Ordinance on the transient citizens of the

1  state outweighs the possible benefit to the locality.

2      100.  That the Ordinance is a regulation on caliber size and purported

3  destructive capabilities is apparent in the Ordinance's history: In the motion to draft

4  the ordinance, CCC cites the destructive capabilities of LCF's as the "background"

5  for the proposal to draft a LCF ban.  Specifically, the "background" of the proposal

6  states:

7          . . . The .50 caliber sniper rifle has *five times the muzzle power of a*
           *.357 magnum handgun*, and *can penetrate nearly eight inches of*
8          *concrete from a distance of 400 yards*.  Originally *designed for heavy*
           *military use*, all types of .50 caliber ammunition are readily available to
9          civilians in the United States and thus easily available to foreign and
           domestic terrorists.  With *such destructive powers*, .50 caliber sniper
10         rifles are no more regulated than hunting rifles and less regulated than
           handguns. . . . (Emphasis added.)
11

12     101.  The final ordinance included "findings in support of Ordinance No

13  2004-10 (Large Caliber Firearms)."  These "findings" conflict with Penal Code

14  section 12301 et seq in their emphasis on the destructive capabilities:

15         • The design of the .50 caliber sniper rifle enables the destruction
           of aircraft, heavy machinery, and infrastructure from long ranges.
16         [Compare ¶58 "The tremendous destructive potential of these weapons
           make them unfit for use outside the confines of a military reservation;"
17         ¶65 "Assembly Bill 1326 deals with weapons and devices which are
           commonly referred to as "military-type weapons" and "heavy
18         weapons"; such weapons are referred to as Destructive devices."]
           • The .50 caliber sniper rifle was originally designed for use in
19         the military but is increasingly sold in the domestic civilian market.
           [Compare ¶58 ". . . there are no statutes regulating the sale or
20         possession of military armaments;" ¶65 ". . . there are presently no laws
           in California which regulate the military surplus and similarly large
21         weapons which are available on the open market."]
           • Ammunition for the .50 caliber sniper rifle has more than seven
22         times the power on impact as the .30-06, five times that of the .308, and
           more than three times that of the .338. [Compare ¶65 "These military
23         weapons and similar devices are extremely hazardous and possess great
           destructive capacity."]
24         • The .50 caliber sniper rifle uses different types of ammunition,
           including ball ammunition, armor piercing ammunition, and armor-
25         piercing-incendiary ammunition.  Ball ammunition is for use against
           personnel and light material targets.  Armor-piercing ammunition is for
26         use against armored aircraft and lightly armored vehicles, concrete
           shelters, and other bullet-resisting targets.  Armor-piercing-incendiary
27         ammunition is tipped with phosphorus and explodes on impact. [*Id.*]
           • One ball cartridge can penetrate two inches of concrete from
28         220 yards and one inch of concrete from 1,640 yards.  From 38 yards,
           50 rounds of ball ammunition can penetrate 10 inches of concrete and

1    15 rounds can penetrate 12 inches of a triple brick wall.  One armor-
2    piercing cartridge can penetrate one inch of armor plate from 220 yards
     and 0.3 inches of armor plate from 1,640 yards. [*Id.*]

3    [CONSTITUTIONAL PREEMPTION - 12070 ET SEQ.]

4    102.  The Ordinance provides the following exception to its prohibition against

5    transfers of "large caliber firearms:"

6    An entity or establishment engaged in the business of motion picture,
7    television, or video production, provided that the large caliber firearm is
     used only as a prop during the course of motion picture, television, or
     video production, is secured from unauthorized use, and the person
8    charged with maintaining custody of the firearm while it is not in use
     maintains a current Certificate of Eligibility issued by the State of
9    California.

10   (Contra Costa County Municipal Code Section 55-22.008(b)(10).)

11   103.  The Ordinance duplicates existing law.  Penal Code section 12070(a)

12   provides that no person shall sell, *lease*, or transfer firearms unless he or she has

13   been issued a license pursuant to Section 12071.  Any person violating this section is

14   guilty of a misdemeanor.  California Penal Code Section 12070(b)(17) provides an

15   exception to this rule: "... [Penal Code section 12070](a) does not include ...[t]he loan

16   of an unloaded firearm or the loan of a firearm loaded with blank cartridges for use

17   solely as a prop for a motion picture, television, video production, entertainment or

18   theatrical event.  To the extent that the Ordinance provides an exception for a firearm

19   that "is used only as a prop during the course of motion picture, television, or video

20   production," the Ordinance duplicates existing law.

21   104.  The Ordinance conflicts with existing law.  The Ordinance exception

22   requires a Certificate of Eligibility, while the Penal Code does not.  The Ordinance

23   requires that the firearm be "secured from unauthorized use, while the Penal Code

24   does not.  These two additional requirements conflict with the State's intention to

25   facilitate motion picture, video and theatrical productions.

26   105.  The Ordinance intrudes into an area that is fully occupied by general law

27   where the legislature has impliedly manifested its intent to fully occupy the area in

28   light of the following indicia:

1     • The subject matter regulating licensing exemptions for motion

2 picture, television, and theatrical production has been completely covered by

3 general law as to clearly indicate that it has become exclusively a matter of

4 state concern.

5     • The subject matter regulating licensing exemptions for motion

6 picture, television, and theatrical production has been covered by general law

7 couched in such terms as to indicate clearly that a paramount state concern

8 will not tolerate further or additional local action.

9     • The subject matter regulating licensing exemptions for motion

10 picture, television, and theatrical production has been covered by general law,

11 and the subject is of such a nature that the adverse affect of a local Ordinance

12 on the transient citizens of the state outweighs the possible benefit to the

13 locality.

14        [GOVERNMENT CODE SECTION 53071 PREEMPTION]

15     106.  The State of California has expressly and implicitly deprived CCC of the

16 powers to regulate firearm "destructive devices." California Government Code

17 section 53071 makes state law the exclusive arbiter as to any firearm whose sale or

18 possession has been permitted, excluded, and/or licensed under state law:

19         It is the intention of the Legislature to occupy the whole field of
regulation of the registration or licensing of commercially manufactured

20         firearms as encompassed by the provisions of the Penal Code, and such
provisions shall be exclusive of all local regulations, relating to

21         registration or licensing of commercially manufactured firearms, by any
political subdivision . . . .

22

23 The Ordinance is a licensing law preempted by Government Code 53071, in part

24 because it prohibits the purchasing and other receipt of what it defines as LCF's by

25 all but 13 categories of potential recipients.  Additionally, Government Code section

26 53071 applies because the Ordinance creates a licensing scheme mandating that

27 those who are required to use LCFs in motion picture studios, video and theater

28 productions first obtain a Certificate of Eligibility.  This is contrary to state law,

1   which does not require any such certificate for motion picture, video or theatrical

2   production.  Thus, the Ordinance creates an entirely new licensing scheme for the

3   entertainment industry doing business within the borders of Contra Costa County.

4        107.  The State of California has demonstrated a legislative intent to

5   completely occupy the field of "Destructive Device" licensing and regulation.

6        108.  The State of California has demonstrated a legislative intent to

7   completely occupy the field of "motion picture, video and theatrical production"

8   licensing, exemptions, and regulation as it relates to firearm acquisition and

9   disposition.

10        109.  Furthermore, as to the broad area of firearms sales, the Legislature has

11   enacted a comprehensive and detailed regulatory scheme (Pen. Code §§12070-

12   12084) which requires the licensing of firearms dealers, places numerous restrictions

13   on firearms sales, and mandates the furnishing of identification information by each

14   purchaser.

15        110.  The state has so thoroughly occupied this field that regulating firearms

16   sales is now beyond the reach of local governments. Cities and counties have been

17   charged with the execution of the State's program for the business licensing of

18   firearms dealers, but their role is ministerial in nature. (Pen. Code §12071.)

19        111.  By the same token, the Legislature has enacted a host of laws against

20   possession or sale of particular firearms it deemed to be contrary to the public

21   welfare. The following provisions of the Penal Code show that the state has regulated

22   so comprehensively as to exclude local prohibition of the sale of commercially

23   manufactured firearms: Penal Code section 12020 outlaws possession of

24   unconventional firearms including cane guns, wallet guns, short barreled rifles and

25   shotguns and high capacity magazines or firearms using high capacity magazines;

26   section 12090ff outlaws sale or possession of firearms which have no serial number;

27   section 12125ff sets standards for "unsafe handguns" and prohibits their sale; section

28   12220 outlaws possession of sub-machine guns, machine guns and other fully

1   automatic weapons except for persons possessing DOJ permits; section 12275ff

2   defines and prohibits the sale and unregistered possession of assault weapons.  In

3   addition, Article 7 of the Penal Code outlaws sale/possession of firearms and

4   ammunition to and by minors, and  Chapters 2.5, 2.6, 3.2 and 4-6 outlaws, or requires

5   state permit for, "destructive devices", certain ammunition, use of firearms or other

6   weapons in booby traps, tear gas weapons, "firearm devices", and requires training

7   and a basic firearms safety certificate.

8       112.   The California Supreme Court deems the frequency of amendment and

9   re-enactment of state laws in a particular area as evidence of state occupation of the

10  field. In fact, the statutes governing firearms possession and sale have received very

11  extensive legislative attention.

12      113.   Moreover the Legislature has repeatedly rejected proposals to authorize

13  cities to enact gun-ban laws, e.g., A.B. 136 (Villaraigosa) 1997-98 session; A.B. 247

14  (Scott) 1997-98 session; S.B. 643 (Polanco) 1997-98 session; A.B. 634 (Caldera)

15  1995-96 session which was identical to A.B. 2706 (Caldera) rejected in the 1993-94

16  session.  Other approaches from the 1993-94 session included SB 1293 (Hayden),

17  AB 2865 (Lee) and ABx 1 37 (Burton).  The rationale on which the Assembly

18  Committee on Public Safety rejected such efforts deserves particular attention:

19      The Legislature, in enacting pre-emption statutes, has expressed its
        intent for the need for *uniform statewide standards relating to . . .*
20      *firearms, [a subject] already involving extensive and comprehensive*
        *regulation by the state.* The need for existing statewide standard and
21      the uniformity it provides could not be more necessary. Conversely,
        permitting any widespread additional local restrictions [regarding] . . .
22      firearms could not possibly add anything other than general confusion to
        the regulatory scheme.
23          – Assembly Committee on Public Safety Hearing Memo
            on AB 634, 2 (Jan. 23, 1996) (emphasis added).
24

25      114.  In recent years, localities have sought to have preemption effects of

26  California firearms laws narrowed, to no avail:  In 1999 the Legislature enacted SB

27  15, the Unsafe Handgun Act (Pen. C §§ 12125 et seq.) whose purpose was to ban the

28  sale of "Saturday Night Specials." It established criteria for handgun safety, defined

1  unsafe handguns and banned their sale as of Jan. 1, 2001.  In enacting SB 15 the

2  Legislature was well aware of the existing local SNS Ordinances as to which the

3  Senate Public Safety Committee report stated: "This bill would appear to preempt

4  any such local Ordinance, both those already in existence and any proposed locally in

5  the future." Among the ways in which the Legislature became aware of the UHA's

6  preemptive effect is that its author and other legislators were informed by the City of

7  San Jose's lobbyist that as  written (and eventually enacted) SB 15 would preempt all

8  these local Ordinances. At the request of the City of San Jose the author amended SB

9  15, adding a proviso stating that the local Ordinances would survive the UHA and

10  not be preempted. This proviso was, however, later stricken from SB 15 and the

11  UHA was enacted without it.

12      115.  In sum, the existence of the .60 caliber ban specifically, and other state

13  firearms bans and regulations generally, demonstrates that the state has occupied the

14  field and localities have no authority to prohibit models or types of firearms in

15  general, or particular calibers of firearms in general.

16

17                     **[DECLARATORY JUDGMENT ALLEGATION]**

18      116.  There is an actual and present controversy between the parties to this suit

19  regarding the Ordinance's consistency with state law.  Plaintiffs contend that the

20  Ordinance is unconstitutional, invalid and preempted because it conflicts with state

21  laws including the Destructive Device laws (Penal Code sections 12301 et seq.),

22  General Firearm Transfer Laws (Penal Code section 12070 et seq.) and Government

23  Code section 53071.  Defendants deny and dispute this contention, wherefore

24  plaintiffs seek a declaratory judgment that the Ordinance is preempted because of its

25  inconsistency and conflict with state law.

26  / / /

27  / / /

28

**[PRAYER]**

WHEREFORE, plaintiffs seek the following relief:

1. Equitable relief enjoining enforcement of Contra Costa County Ordinance 2004-10 or expenditure of funds on it, and compelling CCC to repeal and/or de-publish and refrain from publishing and enforcing Contra Costa County Ordinance 2004-10.

2. Declaratory relief as set out in the body of the petition;

3. That plaintiffs be awarded reasonable attorneys fees pursuant to Title 42 U.S.C. 1988 and Code of Civil Procedure section 1021.5, as well as costs of suit and such other and further relief as the Court deems proper.

Plaintiffs demand a jury trial.

Date: June 2, 2004

TRUTANICH • MICHEL, LLP:

C.D. Michel
Attorneys for Plaintiffs

# EXHIBIT A

ORDINANCE NO. 2004-10

LARGE CALIBER FIREARMS – CONVEYANCE PROHIBITED

The Contra Costa County Board of Supervisors ordains as follows (omitting the parenthetical footnotes from the official text of the enacted or amended provisions of the County Ordinance Code):

**SECTION I.   SUMMARY.** This ordinance adds Chapter 54-22 to the County Ordinance Code to prohibit the sale of .50 caliber firearms in unincorporated areas of the County.

**SECTION II.**   Chapter 54-22 is added to the County Ordinance Code, to read:

**Chapter 54-22**
**LARGE CALIBER FIREARMS – CONVEYANCE PROHIBITED**

**54-22.002 Purpose.** The purpose of this chapter is to protect the health, safety, and general welfare of the residents of Contra Costa County by prohibiting the sale of .50 caliber firearms in unincorporated areas of the County. (Ord. 2004-10 § 2.)

**54-22.004 Definitions.** As used in this chapter, the following terms have the following meanings:

(a)   "Firearm" means any device, designed to be used as a weapon or modified to be used as a weapon, from which is expelled through a barrel a projectile by the force of explosion or other means of combustion.

(b)   "Large caliber firearm" means any rifle capable of firing a center-fire cartridge of .50 caliber or larger or .50 BMG caliber or larger either by designation or by actual measurement.

(c)   "Rifle" means any firearm that is designed or redesigned, made or remade, and intended to be fired from the shoulder and is designed to fire only a single projectile through a rifle bore for each single pull of the trigger. The term "rifle" does not include any shotgun. (Ord. 2004-10 §2.)

**54-22.006 Conveyance Prohibited.** No person shall sell, give, transfer ownership of, transfer, offer for sale, or display for sale any large caliber firearm. (Ord. 2004-10 § 2.)

**54-22.008 Exemptions.**

(a)   The provisions of this chapter do not apply to any of the following:

(1)   Any sale or transfer of a firearm that is prohibited under state law.

03/24/2004   14:56   CONTRA C⁀ ⁀A COUNTY CLERK OF THE → 65767   NO.242   P02

(2) The sale or transfer of any destructive device as defined in Section 12301 of the California Penal Code.

(3) The sale or transfer of any assault weapon as defined in the California Penal Code.

(4) Any firearm approved for sale pursuant to Section 12131 of the California Penal Code.

(b) The provisions of Section 54-22.006 do not apply where the purchaser or transferee is any of the following:

(1) A law enforcement agency.

(2) An agency duly authorized to perform law enforcement duties.

(3) A state or local correctional facility.

(4) A person described in Section 12302 or 12322 of the California Penal Code.

(5) A federal law enforcement officer.

(6) A person who is properly identified as a full-time paid peace officer, as defined in Section 830.1, 830.2, 830.4, or 830.5 of the California Penal Code, and who is authorized to, and does, carry a firearm during the course of his or her employment as a peace officer.

(7) A firearms dealer who has been issued a Federal Firearms License, a Certificate of Eligibility by the State of California, and a permit by the County of Contra Costa to engage in the retail sale of firearms.

(8) A purchaser of a curio or collector firearm. A firearm will be deemed a curio or collector firearm only if it falls within one of the following categories:

(A) It was manufactured before 1899.

(B) It is classified as a curio or relic pursuant to Title 27 Code of Federal Regulations section 178.11, and the purchaser maintains a current federal firearms collector license.

(C) It is a muzzle-loading firearm.

(9) A federal, state, or local historical society, museum, or institutional collection that is

open to the public, provided that the large caliber firearm is used for display purposes, is secured from unauthorized use, and is unloaded.

(10)   An entity or establishment engaged in the business of motion picture, television, or video production, provided that the large caliber firearm is used only as a prop during the course of motion picture, television, or video production, is secured from unauthorized use, and the person charged with maintaining custody of the firearm while it is not in use maintains a current Certificate of Eligibility issued by the State of California.

(11)   A person who obtains title to a large caliber firearm by bequest or intestate succession. (Ord. 2004-10 § 2.)

**54-22.010 Enforcement.**  A violation of this chapter is an infraction.  If a violation of this chapter occurs, the County may seek compliance by any remedy allowed under this code and any other remedy allowed by law.  (Ord. 2004-10 § 2.)

**SECTION III. EFFECTIVE DATE.**  This ordinance becomes effective 30 days after passage, and within 15 days after passage shall be published once with the names of supervisors voting for or against it in the Contra Costa Times, a newspaper published in this County.

PASSED on _____, by the following vote:

AYES:
NOES:
ABSENT:
ABSTAIN:

ATTEST:  JOHN SWEETEN,
          Clerk of the Board of Supervisors          Board Chair
          and County Administrator

By: _____          [SEAL]
          Deputy

TLG:
H:\2004\Board of Supervisors\large caliber firearms ord - rifle.wpd

ORDINANCE NO. 2004-10
3

## FINDINGS IN SUPPORT OF ORDINANCE NO. 2004-10 (Large Caliber Firearms)

1.  The design of the .50 caliber sniper rifle enables the destruction of aircraft, heavy machinery, and infrastructure from long ranges.

2.  The .50 caliber sniper rifle was originally designed for use in the military but is increasingly sold in the domestic civilian market.

3.  The .50 caliber sniper rifle has the capacity to accurately hit targets from a distance of one mile and has a maximum range of approximately four miles.

4.  Ammunition for the .50 caliber sniper rifle has more than seven times the power on impact as the .30-06, five times that of the .308, and more than three times that of the .338.

5.  The .50 caliber sniper rifle uses different types of ammunition, including ball ammunition, armor-piercing ammunition, and armor-piercing-incendiary ammunition. Ball ammunition is for use against personnel and light material targets. Armor-piercing ammunition is for use against armored aircraft and lightly armored vehicles, concrete shelters, and other bullet-resisting targets. Armor-piercing-incendiary ammunition is tipped with phosphorus and explodes on impact.

6.  One ball cartridge can penetrate two inches of concrete from 220 yards and one inch of concrete from 1,640 yards. From 38 yards, 50 rounds of ball ammunition can penetrate 10 inches of concrete and 15 rounds can penetrate 12 inches of a triple brick wall. One armor-piercing cartridge can penetrate one inch of armor plate from 220 yards and 0.3 inches of armor plate from 1,640 yards.

7.  The United States Government Accounting Office, Office of Special Investigations, determined that .50 caliber rifles have been linked to terrorist groups, international drug cartels, domestic drug dealers, and violent criminals.

8.  Contra Costa County has a high concentration of chemical and refinery facilities, which could serve as targets of terrorist attacks with .50 caliber rifles.

# EXHIBIT B

# THE

# DOUBLE GUN



# JOURNAL

VOLUME FIFTEEN   ISSUE 1

SPRING 2004

$12.99 US / $19.95 CAN. / £9 U.K.



7  25274 82020  7

41

THIS LABEL IS REMOVABLE



# HOLLAND & HOLLAND

**LONDON**

## WE HAVE MANY SPORTING GUNS AND RIFLES FOR SALE IN THE UNITED STATES.
### HERE IS A SELECTION.

**NEW HOLLAND & HOLLAND SHOTGUNS**

A pair of 20-bore Royal Side-by-Side 28" ............ *(S414023)* $139,500
A pair of 20-bore Sporting model Over-and-Under 28"
............ *(S80802)* $105,000
A pair of 12-bore Sporting model Over-and-Unders 29"
............ *(S59761-2)* $120,000
12-bore Round Action Sidelock Side-by-Side 28" .....*(S89201)* $45,000
12-bore Royal Side-by-Side 28" ............ *(S41333)* $75,000
A pair of 20-bore Royal model Over-and-Under 28" .*(S10012)* $225,500
20-bore Sporting model Over-and-Under 29" ........*(S69413)* $59,500
Two 12-bore Sporting model Over-and-Unders
............ from $55,600 to $59,500
28-bore Sporting Deluxe model Over & Under 28"....*(S8677)* $52,500

**NEW HOLLAND & HOLLAND RIFLES**

.500/.465 Royal Double Rifle 24" ............ *(S8572)* $120,000
.375 Flanged Royal Deluxe Double Rifle 24" ............*(S8796)* $125,000
.500 Holland & Holland Best Magazine Rifle 24".......*(S4792)* $33,500

**SECOND HAND HOLLAND & HOLLAND SHOTGUNS**

Three 12-bore Royal Side-by-Sides ............ from $50,000 to $42,500
12-bore Dominion Side-by-Side 30" ............ *(S29753)* $7,500
Pairs of 12 & 20-bore Royal Sidelock Ejector Side-by-Sides
............ from $45,000 to $85,000
12-bore Royal Deluxe model Over-and-Under 28" ....*(S8706)* $75,000

12-bore Sporting Deluxe model Over-and-Under 28"*(S86566)* $46,000
28-bore Royal Deluxe Side-by-Side 26" ............ *(S40915)* $52,500

**SECOND HAND HOLLAND & HOLLAND RIFLES**

.270 Deluxe Magazine Rifle 24 1/2" ............ *(S42441)* $22,500
.500/.465 Royal Double Rifle 26" ............ *(S38617)* $47,500
.240 Apex Deluxe Magazine Rifle 24" ............ *(S9235)* $12,000
.243 Deluxe Magazine Rifle 22" ............ *(S4173)* $15,500
.375 Rimless Royal Double Rifle 26" ............ *(S8925)* $79,500

**OTHER MAKES**

J. Purdey 20-bore "Extra Finish" SLE Shotgun 26" ...*(S7856)* $52,500
Westley Richards .375 Magazine Rifle 24" ............ *(S2808)* $14,250
Churchill 12-bore Premier XXV SLE Shotgun 25 .....*(S8116)* $15,500
Cogswell & Harrison .375 Magazine Rifle 26" ........*(S6058)* $6,250
J.Purdey 28-bore Sidelock Ejector Shotgun 26"......*(S2486)* $42,500
Pair Hussey Ltd. 12-bore Sidelock Ejector Shotguns *(S5463-4)* $21,500
Pair Boss 12-bore Sidelock Ejector Shotgun 28" ...*(S86010)* $29,500
Rigby 12-bore Sidelock Ejector Shotgun 27" ..........*(S8674)* $13,950
J. Purdey 12-bore Sidelock Ejector Shotgun 28" ...*(S2469)* $25,000

*Prices, specifications and availability are subject to change without notice*

HOLLAND & HOLLAND SWL
Telephone: 212 752 7755
E-mail: gunroomny@hollandandholland.com
www.hollandandholland.com



## Harpole's HEARTLAND LODGE

Harpole's HEARTLAND WATERFOWL

Nestled between the Mississippi and Illinois Rivers is a veritable wingshooter's heaven, Harpole's Heartland Lodge. For generations, the Mississippi River flyway has offered the most discriminating waterfowl hunters an opportunity to challenge themselves with all of the diving ducks that fly down the great Mississippi flyway, wary mallards who can't resist the flooded corn, milo and bean fields, and large Canadian geese taking advantage of the two large rest lakes. Over 20 blinds and pits make this wild waterfowl spot unmatched anywhere. But you'll find much more than waterfowl at Harpole's. Enjoy hunting Bobwhite quail and pheasants behind some of the finest German Shorthair Pointers and English Pointers in the country on an upland game hunt. Friendly guides will work the dogs, carry the birds and dress the game. Five star accommodations await you when you return from the field. In the finest tradition of hunting, relax next to the large fireplace in our great room, or enjoy a game of pool. Gourmet country dining completes your experience at Harpole's Heartland Lodge.

Specializing in Waterfowl, Upland Game,
Whitetail, and Turkey Hunts

**Call Us Toll Free**
**800-717-HUNT**
**(4868)**

RR 1, Box 8A • Nebo, Illinois 62355
visit our web site at www.heartlandlodge.com or e-mail us at info@heartlandlodge.com




# EXHIBIT C



# SPORTS AFIELD

*AMERICA'S ORIGINAL OUTDOOR MAGAZINE*

## CAPE BUFFALO *up* CLOSE

## The Ultimate Guide to Sable

## TOP SPOTS FOR TROPHY ELK

PLEASE DISPLAY UNTIL JULY 15

$6.99US  $8.99CAN

JUNE/JULY 2004

07>



0  09281 02707  2



# NOW, DAKOTA DOES DOUBLES.

THE DOUBLE RIFLE.

IT SPEAKS OF RUARK AND HEMINGWAY, OF ORANGE SUNSETS OVER THE VELD, OF HEART-POUNDING ENCOUNTERS WITH VERY LARGE, VERY ANGRY CREATURES.

AND NOW, IT SPEAKS WITH DAKOTA ARMS QUALITY AND ELEGANCE. EXCEPTIONAL STRENGTH. OUTSTANDING BALANCE. DESIGNED TO GIVE YOU MORE CONTROL OVER RECOIL. AND VERY EASY ON THE EYES, TOO.

AVAILABLE IN MOST POPULAR CALIBERS, FROM .375 H&H FLANGED TO .470 AND .570 NITRO EXPRESS. THE ULTIMATE RIFLE FOR THE ULTIMATE HUNT. IT'S HIGH TIME A STORIED TRADITION LIKE THIS SPOKE TO YOU.

## DAKOTA ARMS
INC

DAKOTA ARMS, INC.
1310 INDUSTRY RD,
STURGIS, SD 57785
605/347-4686
INFO@DAKOTAARMS.COM
WWW.DAKOTAARMS.COM